**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELTA AIR LINES, INC.,<br>1030 Delta Boulevard<br>Atlanta, GA 30320;<br><br>HAWAIIAN AIRLINES, INC.,<br>3375 Koapaka Street, #G-350<br>Honolulu, HI 96819; and<br><br>AIR LINE PILOTS ASSOCIATION, INT'L,<br>1625 Massachusetts Avenue, N.W., 8th Floor<br>Washington, D.C. 20036,<br><br>          Plaintiffs,<br><br>     v.<br><br>EXPORT-IMPORT BANK OF THE<br>UNITED STATES; FRED P. HOCHBERG,<br>in his Official Capacity as Chairman and<br>President of the Export-Import Bank of the<br>United States; WANDA FELTON, in her<br>Official Capacity as First Vice President and<br>Vice Chair of the Export-Import Bank of the<br>United States; and SEAN MULVANEY,<br>PATRICIA M. LOUI, and LARRY<br>WALTHER, in their Official Capacities as<br>Members of the Board of Directors of the<br>Export-Import Bank of the United States,<br>    811 Vermont Avenue, N.W.<br>    Washington, D.C. 20571,<br><br>          Defendants. | Civil Action No. 13-192 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the

Air Line Pilots Association, International ("ALPA") (collectively "Plaintiffs"), allege as follows:

## NATURE OF THE CASE

1.     Defendant Export-Import Bank of the United States ("Ex-Im Bank" or the

"Bank") is a federal agency and a wholly owned U.S. government corporation that provides

loans, loan guarantees, and insurance commitments to foreign corporations.  The Bank's

obligations carry the full faith and credit of the United States government.  They are meant to be

used for the benefit of U.S. industry and employment by promoting exports.

2.     When the Bank subsidizes exports, its actions can and do have negative impacts

on other U.S. companies and their employees by subsidizing their foreign competitors.  To

prevent the Bank from doing more harm than good, Congress has directed the Bank to consider

the adverse economic impact of its actions.

3.     One of the types of exports that the Bank subsidizes frequently and heavily is the

export of aircraft by U.S. manufacturers and in particular by The Boeing Company ("Boeing").

In FY2012, the Bank's total exposure to outstanding financial commitments was $106.6 billion.

Approximately 46% of this amount was for air transportation loans and loan guarantees—more

than the three next-largest industrial sectors combined.

4.     U.S. airlines and their employees, including Plaintiffs, have protested that the

Bank's subsidies to foreign airlines to help them buy Boeing planes cause adverse economic

effects on U.S. airlines and their employees.  Plaintiffs contend that the Bank is legally required

to consider these adverse economic effects, that it has failed to do so, and that its failure to do so

has led it to approve more financial assistance to airlines than it would have if it had complied

with its statutory requirements.

5.      Delta and ALPA are parties to a recent case challenging the Bank's practice of disregarding adverse economic impact caused by the aircraft transactions it subsidizes.  *See Air Trans. Ass'n of Am. v. Exp.-Imp. Bank of the United States*, 878 F. Supp. 2d 42 (D.D.C. 2012) ("*ATA*"), *appeal pending*, No. 12-5294 (D.C. Cir.).  In *ATA*, Judge Boasberg found on summary judgment that domestic airlines had standing to sue the Bank and that the Bank's financing decisions were subject to judicial review, but that the Bank had properly interpreted its statutory mandate to permit it to exempt from substantive economic impact analysis any transaction which did not result in the foreign production of an "exportable good."  That determination is now on appeal before the D.C. Circuit.

6.      While the *ATA* case was pending, Congress passed the Export-Import Bank Reauthorization Act of 2012, Pub. L. No. 112-122, 126 Stat. 350 ("Reauthorization Act"). Among other things, the Reauthorization Act requires the Bank to "develop and make publicly available methodological guidelines to be used by the Bank in conducting economic impact analyses or similar studies."  *Id.* § 12, 126 Stat. at 357.  It also requires the Bank to give public notice and respond to comments on certain large export transactions exceeding $100,000,000 in value, and to include in its notice a description of whether the exported "item may be used to . . . provide services in competition with . . . the provision of services by a United States industry." *Id.* § 9, 126 Stat. at 354.

7.      Pursuant to the Reauthorization Act, the Bank has promulgated a set of Economic Impact Procedures and Methodological Guidelines that will take effect in April 2013 ("Procedures and Guidelines").  These new Procedures and Guidelines, which the Bank has made available at http://www.exim.gov/generalbankpolicies/economicimpact/upload/Final-

April-2013-Procedures.pdf, outline in an appendix a special process that the Bank intends to use to consider the adverse economic impact caused by its subsidies to foreign airlines.

8.     This action is a challenge under the Administrative Procedure Act ("APA") to the Bank's new Procedures and Guidelines.  As set forth in this Complaint, the new Procedures and Guidelines violate the Bank's Charter, the Reauthorization Act, and the Administrative Procedure Act for the following reasons:

a.     The new Procedures impose screens that will exempt from substantive economic analysis a large majority (85% – 90%, according to the Bank's estimates) of aircraft transactions.  The sheer number of aircraft transactions excluded by these screens is contrary to the Bank's statutory mandates, and the criteria the Bank has chosen for exclusion cannot be reconciled with Congress's intent.

b.     To the extent the Bank attempts to justify the new screens imposed by the Procedures and Guidelines, its attempts to do so are arbitrary and capricious.

c.     When Plaintiffs and others – including several government agencies – provided comments following the Bank's solicitation of public comments on its proposed new economic impact procedures and methodological guidelines, the Bank rejected those comments without any reasoned justification and failed to respond to the reasonable concerns that the commenters had raised.

9.     Plaintiffs ask this Court to set aside the Bank's new Procedures and Guidelines and prevent the Bank from using them to avoid substantive scrutiny of its continuing practice of subsidizing foreign airlines at the expense of their U.S. competitors.

**JURISDICTION AND VENUE**

10.     This is an action seeking relief under the APA, 5 U.S.C. § 702.  The Court has subject matter jurisdiction over such an action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States, and at least one defendant resides in this district.

**PARTIES**

12.     Plaintiff Delta is an airline that provides scheduled air transportation for passengers and cargo throughout the United States and around the world.  Delta's global route network gives it a presence in every major domestic and international market.  Delta's route network is centered around the hub system that it operates in several major cities, such as Amsterdam, Atlanta, New York, Paris, and Tokyo.  Each of these hub operations includes flights that gather and distribute traffic from markets in the geographic region surrounding the hub to domestic and international cities and to other hubs.

13.     Delta is a Delaware corporation which has its headquarters in Atlanta, Georgia.

14.     Plaintiff Hawaiian is an airline based in Honolulu, Hawaii, that provides scheduled air transportation for passengers and cargo.  Hawaiian has been in continuous operation for 84 years and is the largest provider of passenger air service from and to Hawaii's primary visitor markets on the U.S. mainland.  Hawaiian offers more nonstop service between Hawaii and U.S. gateway cities (11) than any other airline, along with service from and to Japan, South Korea, the Philippines, Australia, American Samoa, and Tahiti.  Hawaiian also provides approximately 170 daily jet flights between the Hawaiian Islands.

15.     Hawaiian is a Delaware corporation with its headquarters in Honolulu, Hawaii.

16.     Plaintiff ALPA is an unincorporated labor organization representing approximately 47,000 pilots employed by 28 United States commercial airlines.  Among the pilots represented by ALPA are those who work for airlines which provide significant international services (including Alaska, United, Delta, FedEx, and Hawaiian).  ALPA has an international headquarters office in Washington, D.C.

17.     Defendant Ex-Im Bank is the official export credit agency ("ECA") of the United States.  The Bank is headquartered in Washington, D.C.  The Bank offers working capital guarantees, export credit insurance, direct loans, and loan guarantees to benefit U.S. exporters.

18.     Defendant Fred P. Hochberg is the Bank's President and Chairman.  He has overall responsibility for assuring the Bank's compliance with the law.  He is sued in his official capacity only.

19.     Defendant Wanda Felton is the Bank's First Vice President and Vice Chair.  She voted to approve the Procedures and Guidelines.  She is sued in her official capacity only.

20.     Defendants Sean Mulvaney, Patricia M. Loui, and Larry Walther are members of the Bank's Board of Directors.  Defendants Mulvaney, Loui, and Walther all voted to approve the Procedures and Guidelines.  They are sued in their official capacities only.

## STATUTORY FRAMEWORK

21.     President Franklin D. Roosevelt established the original Export-Import Bank of Washington during the Great Depression in order to "reduce and relieve unemployment, to improve standards of labor, and otherwise rehabilitate industry" by increasing U.S. exports.  Exec. Order No. 6581, 12 C.F.R. § 401 (Feb. 2, 1934), *reprinted as amended in* 12 U.S.C. § 635.  Congress turned the corporation into an "agency of the United States" and codified its powers in

the Bank Act, under which the Bank's "objective" in making loans, loan guarantees, and other commitments continues to be "maintaining or increasing employment of United States workers." 12 U.S.C. § 635(a)(1).  The Bank Act further expresses "the policy of the United States that the Bank in the exercise of its functions should supplement and encourage, and not compete with, private capital."  *Id.* § 635(b)(1)(B).

22.     The Bank Act authorizes the Bank to extend various types of commitments to foreign buyers, including direct loans and loan guarantees, but expressly requires that such commitments comply with several procedural requirements and substantive prohibitions.  *Id.* § 635(b)(1)(A).

23.     In particular, the Bank Act requires the Bank to consider, among other things, the adverse effect its commitments will have on U.S. industries and employment.  *Id.* §§ 635(b)(1), 635a-2, 635(e).

24.     The Reauthorization Act of 2012 requires the Bank, not later than 180 days after the date of its enactment, to "develop and make publicly available methodological guidelines to be used by the Bank in conducting economic impact analyses or similar studies under section 2(e) of the Export-Import Bank Act of 1945."  Export-Import Bank Reauthorization Act of 2012 § 12, 126 Stat. at 357.

25.     The Reauthorization Act also requires the Bank to give public notice and respond to comments on certain large export transactions exceeding $100,000,000 in value, and to include in its notice a description of whether the exported "item may be used to . . . provide services in competition with . . . the provision of services by a United States industry."  *Id.* § 9, 126 Stat. at 354.

26.     The APA provides a right of action against government agencies such as Ex-Im Bank where their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D); *see id.* § 702.  The APA also requires an agency such as the Bank to give public notice, solicit public comment, and respond to comments that it receives before promulgating substantive rules.  *See* 5 U.S.C. § 553.

## FACTS AND PROCEDURAL HISTORY

**A.      Ex-Im Bank's Aircraft Financing for Foreign Airlines**

27.     Ex-Im Bank devotes a very substantial portion of its financial commitments to aircraft financing.  From FY2001 to FY2012, the Bank approved more than $67 billion in loan guarantees to foreign carriers and international aircraft lessors.  Those loan guarantees allowed foreign airlines to acquire more than 950 commercial aircraft at below-market rates.

28.     From 2007 to 2010, more than 60% of Ex-Im Bank's total loan-guarantee portfolio was devoted to this purpose.  In FY2012, more than 46% of the Bank's exposure was in the air transportation industry.  The amount of its exposure that the Bank allocates to this sector is more than 2.5 times larger than the next largest sector and is larger than the next three sectors combined.

29.     Ex-Im Bank's financing is not available to U.S. airlines, including Delta, Hawaiian, and the other U.S. airlines that employ pilots represented by ALPA.  Further, under an arrangement between the Bank and European ECAs that is known as the Home Market Rule, financing from European ECAs is also not available to U.S. airlines.  Accordingly, when U.S. airlines purchase aircraft from Boeing or from its principal European competitor Airbus, they

cannot take advantage of government-backed financing, but must instead seek financing from purely private sources.

**B.      Harm Caused to U.S. Airlines and Airline Employees**

30.     The ability to buy Boeing aircraft using loan guarantees that are backed by the U.S. Treasury gives a significant competitive advantage to the favored foreign airlines.  These airlines are able to raise capital more cheaply and on more favorable terms than they otherwise could.  In some cases, foreign airlines are able with the Bank's support to buy aircraft that they could not otherwise have financed at all on economically feasible terms.

31.     The newly purchased aircraft that foreign airlines purchase with the Bank's assistance also give the foreign airlines competitive advantages by reducing their fuel and maintenance costs; attracting customers who wish to fly on newer, more desirable planes; and enabling the airlines to charge prices for seats on the *newer* aircraft that are lower than the prices that U.S. airlines must charge for seats on competitive routes on the *older* aircraft that make up their fleets.

32.     Delta, Hawaiian, and the other U.S. airlines that employ pilots represented by ALPA compete directly with the favored foreign airlines that enjoy these benefits.  Delta, Hawaiian, and the other U.S. airlines suffer economic harm as a result of the subsidized competition they face.

33.     In order to compete with the favored foreign airlines, U.S. airlines must take steps such as reducing or altogether eliminating their capacity to serve certain routes.  U.S. airlines may also forego serving routes they would otherwise serve.  These steps harm the U.S. employees whom ALPA represents because they lead to lost and displaced jobs and fewer hours available to work.

34.     This Court can redress the injury the Bank causes to U.S. airlines and their

employees by requiring the Bank to comply with its statutory mandates to fully consider the

adverse economic harm caused by subsidizing foreign airlines' purchases of Boeing aircraft.

35.     Plaintiffs have previously submitted comments to the Bank urging it to take into

account the harm that its subsidies are doing to U.S. airlines and their employees.  Plaintiffs

intend to continue to submit such comments in the future.

**C.     The Bank's Proposed Procedures and Request for Comments**

36.     On September 27, 2012, the Bank published a proposed set of Procedures and

Methodological Guidelines (the "Proposed Procedures and Guidelines") and requested

comments.  The Proposed Procedures and Guidelines were called to the attention of the public at

77 Fed. Reg. 59,397, and are available at

http://www.exim.gov/generalbankpolicies/economicimpact/upload/9-27-2012-Proposal-

Economic-Impact-Procedures-and-Methodological-Guidelines.pdf (last visited February 4,

2013).

37.     The Bank's proposal was divided into two sections.  Section 1 contained proposed

procedures that describe a screening process consisting of five different stages.  Section 2

contained proposed guidelines that set forth a "Detailed Analysis" whereby the Bank "evaluates

the transaction using technical mechanisms to consider the implications of providing support for

the transaction."  Proposed Procedures and Guidelines at 8.

38.     The Proposed Procedures and Guidelines would treat transactions that resulted in

the production of an exportable good differently than transactions that resulted in the production

of an exportable service.  Indeed, the Bank set forth an entirely separate "methodology for

economic impact review of aircraft . . . in Attachment A" to the Proposed Procedures and

Guidelines.  *Id.* at 3 n.7.  The Bank stated that this different treatment was justified by "inherent

differences between the dynamics of services trade flow as compared to goods trade flow" that required a "sector specific" analysis of services.  *Id*.  The Bank further stated that at the present time, "the only transactions creating an exportable service deemed to meet the above criteria is [sic] aircraft."  *Id*.

39.     The Bank did not offer any further support or analysis in the Proposed Procedures and Guidelines for its statement that there were "inherent differences between the dynamics of services trade flow as compared to goods trade flow" and did not make any information supporting this statement available to interested members of the public who wished to comment on this topic.

40.     The aircraft-specific procedures proposed by the Bank (and later adopted without substantial change) operate in stages.  Stage I is not transaction-specific, but a stage that the Bank revisits every year to determine whether there is a "long-run structural oversupply" in the global airline industry.

41.     The Bank does not define the term "long-run structural oversupply."

42.     If the Bank determines that a long-run structural oversupply exists in the industry, the Bank will look to "see if there were exceptional circumstances which could justify Ex-Im Bank support" for each proposed transaction.  *Id.* at 15.

43.     If no structural oversupply is found, the Bank's analysis of every aircraft transaction will commence at "Stage II," which looks to see if "the possible adverse implications [of the transaction] could be substantial."  The Bank will subject each transaction to "a series of three tests – taken in order (with the first 'failure to pass' stopping additional review)."  *Id.*

44.     The three Stage II tests are 1) whether "the evaluated transaction . . . exceed[s] $200 million"; 2) whether "the daily seat capacity . . . equal[s] or exceed[s] 1% of the current

daily capacity of U.S. airline industry"; and 3) whether "the routes likely to be flown . . . include a significant number of flights in direct (non-stop or one-stop/same plane) competition with U.S. airlines." *Id.* at 15-16.  All these measures will only look at the first three years (or less) of each transaction.  If a transaction fails to meet any one of these criteria, the transaction will be "cleared for credit analysis without further economic impact review." *Id.* at 16.

45.     Any transactions remaining after the three Stage II tests will then be subject to Stage III.  Concerning Stage III, the Bank stated that "[u]nlike goods, which can be, and are, considered 'commodities' and therefore totally interchangeable for economic impact trade flow analysis, services (especially airline services) are by their nature highly differentiated." *Id.* According to the Bank, this means that "the mere existence of an alternative is not sufficient to say that Ex-Im Bank is actually helping to put in place competition that could (or should be considered to) displace U.S. services." *Id.*

46.     The Bank did not offer any further support or analysis in the Proposed Procedures and Guidelines for its statement that "the mere existence of an alternative" – by which it appears to mean the existence of head-to-head competition between U.S. and foreign airlines – "is not sufficient to say that Ex-Im Bank is actually helping to put in place competition that could (or should be considered to) displace U.S. services," and did not make any information supporting this statement available to interested members of the public who wished to comment on this statement. *Id.*

47.     At Stage III, the Bank will examine two questions: whether "export credit agency (ECA) support provide[s] a price advantage" to a foreign airline, and if so whether "that price advantage translate[s] into a calculable direct loss." *Id.*  The Bank further stated that "availability is assumed to always exist from another ECA," by which it appears to mean that it

will conduct its analysis under the assumption that a foreign airline would always and without exception purchase a non-Boeing aircraft with the support of a foreign ECA if the Bank does not finance the Boeing transaction itself.  *Id.*

48.     The Bank did not offer any further support or analysis in the Proposed Procedures and Guidelines for its statement that "availability is assumed to always exist from another ECA," and it did not make any information supporting this statement available to interested members of the public who wished to comment on this statement.

49.     Any transactions remaining after the Stage III tests (that is, any for which a "calculable direct loss" is found) will then be subject to Stage IV.  At Stage IV, the Bank will compare the "quantification of the likely impact of the price difference on relative market share and total income potentially lost by the U.S. airline" to the "export value of the three-year order package under review (and any future spares/replacements of the order package) to evaluate whether there [is] likely to be a net economic benefit to the order package."  *Id.*

50.     The Bank offers a detailed methodology for how it will conduct a cost-benefit analysis for transactions that subsidize the foreign production of goods, but no methodology for how it will conduct a cost-benefit analysis for transactions that subsidize the foreign production of services.  *Compare id.* at 8-14 *with id.* at 17.

51.      In its notice, the Bank stated that interested parties had 14 days to submit their comments to the Bank.

52.     On October 1, 2012, Delta sent a letter to the Bank in which it objected to the shortened 14-day comment period listed in the Bank's Federal Register notice as contrary to the 30-day notice requirement in the APA.  *See* 5 U.S.C. § 553(d).

53.     On October 4, 2012, the Bank responded with a letter stating that it would adhere to the 14-day deadline.  The Bank's letter stated that the "tight deadline" imposed by Congress in the Reauthorization Act – which gave the Bank a total of 180 days to develop and publish its new guidelines – precluded the Bank from allotting 30 days for comments.

### D.     Comments on the Proposed Procedures and Guidelines

54.     On October 11, 2012, within the 14-day deadline set forth in the Bank's request for comments, Delta and ALPA submitted comments to the Bank.  Delta and ALPA's comments, which are available at http://www.exim.gov/generalbankpolicies/economicimpact/upload/Public-Comment-Nov-5-2012.pdf (last visited Feb. 4, 2013),[1] included supporting declarations from two economists, Delta's Chief Executive Officer, and Delta's Chief Financial Officer, as well as supporting exhibits.[2]

55.     In their comments, Delta and ALPA explained their interest in ensuring that the Bank comply with the congressional mandate to "take into account any serious adverse effect of [any] loan or guarantee on the competitive position of United States industry . . . and employment in the United States."  Delta and ALPA Comments at 2 (quoting 12 U.S.C. § 635(b)(1)(B)).  The comments further explained the impact of the Bank's loan guarantees on Delta and other U.S. airlines, as well as their employees.

---

[1] The Bank compiled all the public comments it received into a single document, entitled "Export-Import Bank of the United States: Public Comments on the 2012 Proposed Economic Impact Procedures."  Delta and ALPA's comments are found at pages 28-282 of that document and for convenience are hereinafter referred to as "Delta and ALPA Comments."

[2] Plaintiffs incorporate Delta and ALPA's comments and all attached exhibits into this Complaint in their entirety by reference and reserve the right to rely in this action on all arguments and information set forth therein.  The summary provided in paragraphs 54 to 56 of this Complaint sets forth the major points made in the Delta and ALPA Comments for ease of reference.

56.     Delta and ALPA also set forth arguments and evidence expressing concern about numerous problems with the Proposed Procedures and Guidelines, including the following ten issues:

a.     The Bank's dramatically different treatment of exportable services and exportable goods is unjustified under the Bank Act and the Reauthorization Act.  Further, the different treatment ignores evidence that consumers view airline seats as commodities, choosing them based on availability and price.  *See id.* at 7-10, 19-20.

b.     "[A]ny evaluation of structural oversupply must focus on international routes to and from the United States, not on the airline industry generally" because it is on these international routes that the Bank's subsidies have the most significant effect on U.S. airlines and their employees.  *Id.* at 11.  Further, the Bank should permit industry experts to participate in the process of evaluating oversupply.  *See id.* at 11-12.

c.     The Bank's proposed Stage II tests would exclude virtually all aircraft transactions from further review, contrary to the Bank's mandates in the Bank Act and the Reauthorization Act to consider the economic consequences of its actions for U.S. industry and employees.  *See id.* at 13-18.

d.     Neither the Bank Act, the Reauthorization Act, nor anything in the record justifies the Bank's proposed $200 million threshold and for its decision to apply that threshold based only on the first three years of a particular aircraft transaction.  The $200 million threshold would exclude many transactions that would adversely impact U.S. airlines and their employees.  *See id.* at 13-14.

e.     The Bank's 1% test is inappropriate because it measures three years of aircraft transactions against "*total* U.S. carrier capacity."  This minimizes the

consequences of transactions by including purely domestic U.S. capacity (as to which foreign airlines do not compete) and irrelevant international routes that are not served by airlines receiving Bank financing.  *See id.* at 14-16.

f.      The Bank's Stage II analysis appears to require that the foreign airline will use the *particular airplanes* purchased using Bank subsidies in direct competition with U.S. airlines in an undefined "significant number" of flights.  In addition to being vague, this requirement unreasonably ignores the essentially fungible nature of planes, and excludes without justification transactions in which foreign airline can obtain a competitive advantage over one or more U.S. airlines by using new planes to free up additional capacity for direct competition with the U.S. airlines.  *See id.* at 16-18.

g.      The Bank's Stage III analysis makes the unjustified assumption that available financing *always* exists from another ECA.  The Bank has previously assumed just the opposite; it has offered no justification for its change in position; and the available evidence suggests that the Bank's new assumption is not true in reality.  *See id.* at 1-4, 20-21.

h.      The Bank fails to provide sufficient detail about the actual methodology it would use at both Stage III and Stage IV of the analysis, making it difficult or impossible to provide informed or useful comment on these stages.  *See id.* at 21, 23-24.

i.      The Bank fails to refer to or consider the substantial body of guidance from the Office of Management and Budget on how regulatory agencies should conduct cost-benefit analyses, despite Congress's specific directive that the Bank take such relevant OMB guidance into account.  *Id.* at 23-24.

j.      The Bank's use of the *entire* export value as the measure of the benefit it provides to the U.S. economy is inappropriate because much of that value will reflect outsourced goods and services which were manufactured or performed outside of the United States.  The Bank should apply a discount factor to the export value to account for this substantial outsourcing.  *Id.* at 24.

57.     On October 26, 2012, after the 14-day notice period but within 30 days of the Bank's notice regarding its Proposed Procedures and Guidelines, the President and Chief Executive of Hawaiian submitted a letter to the Bank expressing Hawaiian's position that "international competitors should not receive subsidies that artificially lower their costs and distort the market — especially when the source of the subsidy is the U.S. government."

58.     In addition to the comments it received from Plaintiffs, the Bank received comments from several other interested parties and industry groups, including the Boeing Company.  The Bank also engaged three experts to comment on the Proposed Procedures and Guidelines, two of whom commented on Delta and ALPA's comments.  *See* Export-Import Bank of the United States: Comments from Experts Engaged by Ex-Im Bank on the 2012 Proposed Economic Impact Procedures, Nov. 5, 2012, *available at* http://www.exim.gov/generalbankpolicies/economicimpact/upload/Public-Expert-comment.pdf (last visited Feb. 4, 2013) ("Expert Comments").  Both experts had areas in which they agreed and areas in which they disagreed with Delta.

59.     One of these experts was C. Fred Bergsten, the Director of the Peterson Institute for International Economics.  *See* Expert Comments at 3-8.  Among other things, Mr. Bergsten agreed with Delta's position that "flying passengers or cargos to a foreign destination counts as a

*service export*, and the mission of Ex-Im and other ECAs is to support exports *both* of goods and services." *Id.* at 7.  (emphasis added).

60.     Another expert retained by the Bank was William Spriggs, the Chief Economist of the AFL-CIO.  *See id.* at 19-23.  Among other things, Mr. Spriggs agreed with "an important . . . point raised by Delta Airlines, et. al., that many job inputs into U.S. airplanes are not from U.S. workers." *Id.* at 21.  Mr. Spriggs proposed that any economic-impact analysis should focus on U.S. workers.  *Id.*

61.     The Bank also solicited and received comments from various U.S. Government agencies concerning its Proposed Procedures and Guidelines.  The Bank did not make the comments themselves available to the public, but made a summary of these comments available on its website.  *See* Summary of USG Agency Comments to the September 27, 2012 Economic Impact Proposal, *available at* http://www.exim.gov/generalbankpolicies/economicimpact/upload/Public-Summary-of-comment-from-NAC-agencies.pdf (last visited Feb. 4, 2013).  The Bank's summary states, among other things, that the commenting agencies expressed concern that "the criteria for meeting the 1% substantial injury standard (daily seat capacity, a criterion for triggering a detailed economic impact analysis) seems too high, and the proposed price advantage analysis raises concerns, including feasibility of the analysis." *Id.*

**D.     The Final Procedures**

62.     On November 5, 2012, the Bank's Policy Group submitted a memorandum to the Board of Directors concerning the Proposed Procedures and Guidelines.  *See* Memorandum, Export-Import Bank of the United States, *available at* http://www.exim.gov/generalbankpolicies/economicimpact/upload/Board-Memo.pdf (last visited Feb. 4, 2013) ("Board Memorandum").

63.     The memorandum explained that because the various statutory provisions call on the Bank to focus on "substantial, serious and likely adverse effects," the Bank developed the Procedures to "screen out those cases that are not likely to have an adverse effect."  *Id.* at 1-2.

64.     The Board Memorandum did not address any of the submitted comments.

65.     The Board Memorandum attached a "Proposal" for the Board to adopt.  *Id.* at 1. The differences between the Proposal and the Proposed Procedures and Guidelines on which the Bank originally sought comment were small.  There are three differences that pertain to aircraft transactions.

   a.     The Proposal defined the size of an "evaluated transaction" for purposes of economic impact review not as the first three years of the transaction, but as the "total number/value of Ex-Im Bank supported aircraft to be (or has been) delivered in the greater of: (a) the authorization upon which the Detailed Economic Impact Analysis is based, or (b) 12 months of such deliveries after/around/preceding the date of the authorization."  *Id.* at 17 n.26.

   b.     The following formula is used for applying the 1% test in Stage II:

(Total seats in: deliveries covered by an Ex-Im authorization OR the next 12 months of deliveries of final orders to be funded by Ex-Im [whichever value is greater]) / (Total seats in U.S. fleet of either wide-body or narrow-body aircraft [if there is a mix of both types of aircraft in the order, the calculation will be performed twice])

*See id.* at 17-18.

   c.     Stages III and IV (the stages that follow the 1% test) are merged into a single "Detailed [Economic Impact] Analysis."  *Id.* at 19.

66.     The Bank did not provide any explanation for these changes.

67.     So far as is apparent from the public record, no employee of the Bank, and none of the Defendants, ever addressed, considered, or responded to any of the submitted comments,

including the comments from Plaintiffs, from the Bank's own hired experts, from the government agencies, or from anyone else.

68.     On November 19, 2012, the Bank's Board of Directors voted on and formally approved the Proposal as the Bank's new Procedures and Guidelines.  The Board did this in the same way that it approves individual final commitments for aircraft, except that the Bank's approval vote was open to the public.  *See* Exp.-Imp. Bank of United States, Summary of Minutes of Meeting of Board of Directors, *available at* http://www.exim.gov/newsandevents/ boardmeetings/board/boardmeeting-agenda.cfm?pageID=21467 (last visited Feb. 3, 2013).

69.     The Bank subsequently published on its website the new Economic Impact Procedures and Methodological Guidelines, to be effective April 2013.  *See* http://www.exim.gov/generalbankpolicies/economicimpact/economic-impact-procedures.cfm.

### COUNT I
### 5 U.S.C. § 706(2)(C)

70.     All preceding paragraphs are repeated, realleged, and incorporated.

71.     The Bank's Procedures and Guidelines, as finally adopted by the Bank's Board, are substantive regulations and/or final agency action that adversely impact Plaintiffs.

72.     The Bank's Procedures and Guidelines exceed Defendants' statutory authority and are not in accordance with law under the Bank Act and under the Reauthorization Act.

73.     The Court should vacate and set aside the Procedures and Guidelines under 5 U.S.C. § 706(2)(C).

### COUNT II
### 5 U.S.C. §§ 553, 706(2)(D)

74.     All preceding paragraphs are repeated, realleged, and incorporated.

75.     The Bank's Procedures and Guidelines, as finally adopted by the Bank's Board, are substantive regulations that adversely impact Plaintiffs.

76.     The Bank promulgated its Procedures and Guidelines in violation of the procedural requirements of 5 U.S.C. § 553.

77.     The Court should vacate and set aside the Procedures and Guidelines under 5 U.S.C. § 706(2)(D).

## COUNT III
### 5 U.S.C. § 706(2)(A)

78.     All preceding paragraphs are repeated, realleged, and incorporated.

79.     The Bank's Procedures and Guidelines, as finally adopted by the Bank's Board, are substantive regulations and/or final agency action that adversely impact Plaintiffs.

80.     The Bank's actions in promulgating its Procedures and Guidelines were arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

81.     The Court should vacate and set aside the Procedures and Guidelines under 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Delta, Hawaiian, and ALPA request as relief an order of this Court:

A.     Declaring that Defendants violated the APA by promulgating the Bank's Procedures and Guidelines;

B.     Declaring any action previously taken by the Bank or any Defendant under the Procedures and Guidelines null and void, and setting any such action aside;

C.     Vacating the Bank's Procedures and Guidelines;

D.     Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action whatsoever pursuant to the Procedures and Guidelines;

E.      Awarding Plaintiffs their reasonable costs, fees, and attorneys' fees incurred in bringing this action; and

F.      Granting such other legal and equitable relief as the Court deems just and proper.

Date:  February 13, 2013

Respectfully submitted,

/s/ Jonathan B. Hill (by authorization)
Jonathan B. Hill (Bar No. 141473)
DOW LOHNES P.L.L.C.
1200 New Hampshire Avenue, N.W.
Suite 800
Washington, D.C. 20036-6802
(202) 776-2725
jhill@dowlohnes.com

*Attorneys for Plaintiff Hawaiian Airlines, Inc.*

/s/ R. Russell Bailey (by authorization)
Jonathan A. Cohen (Bar No. 952861)
R. Russell Bailey (Bar No. 339093)
David M. Semanchik (Bar No. 502837)
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
1625 Massachusetts Avenue NW, 8th Floor
Washington, DC 20036
Phone:  202-797-4086
Jonathan.Cohen@alpa.org
Russell.Bailey@alpa.org
David.Semanchik@alpa.org

*Attorneys for Plaintiff Air Line Pilots Association, International*

/s/ Michael K. Kellogg
Michael K. Kellogg (Bar No. 372049)
Wan J. Kim (Bar No. 454269)
Gregory G. Rapawy (Bar No. 493973)
W. Joss Nichols (Bar No. 1001126)
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@khhte.com
wkim@khhte.com
grapawy@khhte.com
jnichols@khhte.com

*Attorneys for Plaintiff Delta Air Lines, Inc.*