# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DELTA AIR LINES, INC., *et al.*,      :
                                     :
        Plaintiffs,                  :      Civil Action No.:      13-0192 (RC)
                                     :
        v.                           :      Re Document Nos.:   14, 43, 44, 50
                                     :
EXPORT-IMPORT BANK OF THE,           :
UNITED STATES, *et al.*,             :
                                     :
        Defendants.                  :

## MEMORANDUM OPINION

### GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING AS MOOT DEFENDANTS' AND PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; AND DENYING AS MOOT PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

## I. INTRODUCTION

The Export-Import Bank ("Ex-Im Bank" or "Bank") is an independent agency

established in 1934 as the official export credit agency ("ECA") of the United States to promote

and facilitate U.S. exports by providing loans and loan guarantees to foreign purchasers of U.S.-

manufactured goods and services.  The U.S. aircraft manufacturing industry is one of many

domestic industries that rely on Ex-Im Bank support to compete with foreign manufacturers that

receive similar support from foreign ECAs.  But while U.S. aircraft manufacturers enjoy the

benefits of the Ex-Im Bank's assistance in selling their planes to foreign airline purchasers, U.S.

commercial airlines, which are not eligible for financing from the Bank, object to the boost that

the Bank's support provides to overseas competitors.

Delta Air Lines, Inc. ("Delta"), Hawaiian Airlines, Inc. ("Hawaiian"), and the Air Line

Pilots Association, International ("ALPA") (collectively, "Plaintiffs") are among those that

protest the Ex-Im Bank's support of foreign aircraft purchasers.  Together, Plaintiffs have

embarked on a multipronged litigation attack against the Ex-Im Bank and its Board of Directors (collectively, "Defendants"), in which they maintain, among other things, that the Bank has violated the Export-Import Bank Act of 1945 ("Bank Act" or "Charter") and the Administrative Procedure Act ("APA") through the adoption and application of certain internal economic impact procedures ("EIPs"), which the Bank uses to assess the economic effects of potential transactions within its broader process of determining whether to approve an application for Bank financing.

Specifically at issue in this action — one of three separate lawsuits brought by Plaintiffs currently pending before this Court — is Plaintiffs' challenge to the facial validity of the Ex-Im Bank's 2013 EIPs and Guidelines, which were adopted in November 2012 and became effective on April 1, 2013.  The most recent EIPs include, for the first time, specific procedures for analyzing aircraft transactions, whereas prior versions of the EIPs included an "exportable goods screen" that categorically excluded from in-depth economic impact analysis any proposed transaction that would result in the foreign provision of exportable services, such as airline services, rather than the production of an exportable good.

Defendants have filed a motion to dismiss and a motion for summary judgment, and Plaintiffs have filed a motion for summary judgment.  Together, these motions raise a variety of issues ranging from Plaintiffs' standing to the Bank's compliance with the Bank Act to the Bank's procedural obligations under the APA.  In the end, however, the Court concludes that it must stop short of reaching the merits of Plaintiffs' facial challenge to the new EIPs for two reasons.  First, Plaintiffs have not established an imminent injury-in-fact resulting from the Bank's mere adoption of the new guidelines, as is required for standing under Article III.  Second, Plaintiffs' challenge is not ripe because the claims are unfit for judicial review, and in the meantime, Plaintiffs have not demonstrated that they will suffer any sufficient hardship while

judicial review is delayed.  Thus, upon consideration of the parties' motions and the memoranda in support thereof and opposition thereto, the Court will grant Defendants' motion to dismiss and deny the remaining motions as moot.

## II.  BACKGROUND

### A.  Statutory Framework: The Ex-Im Bank And The Bank Act

The Ex-Im Bank is an independent federal agency and corporation that has its origins in a 1934 Executive Order issued by then-President Franklin Roosevelt.  *See* Exec. Order No. 6581 (Feb. 2, 1934).  The Bank assumed its current form with the passage of the Bank Act, ch. 341, 59 Stat. 526, which, as amended and codified at 12 U.S.C. § 635 *et seq.*, remains the Bank's governing Charter.  The Bank Act declares that "[t]he Bank's objective in authorizing loans, guarantees, insurance, and credits shall be to contribute to maintaining or increasing employment of United States workers."  12 U.S.C. § 635(a)(1).  "In connection with and in furtherance of its objects and purposes, the Bank is authorized and empowered to do a general banking business," including "to guarantee, insure, coinsure, and reinsure against political and credit risks of loss." *Id*.  Loans and loan guarantees issued by the Ex-Im Bank carry the full faith and credit of the United States government, *id*. § 635k, and Congress has reauthorized the Bank on more than twenty occasions since 1947.[1]

The Bank Act identifies many policy concerns for the Bank to take into consideration when deciding whether to approve an application for financing support.  In particular, the statute

---

[1]     At the time this lawsuit was filed, the Bank Act was slated to expire on September 30, 2014, but Congress has since extended the Act through June 30, 2015.  *See* Pub. L. No. 113-164, § 147, 128 Stat. 1867 (2014).  Thus, as part of that next reauthorization process, Congress will have another opportunity to clearly communicate to all interested parties what role it wants the Bank to play in financing aircraft transactions.

requires the Bank to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports." *Id*. § 635(b)(1)(B)(ii).  The statute also declares that it is "the policy of the United States that loans made by the Bank in all its programs shall bear interest … at rates and on terms and conditions which are fully competitive with exports of other countries, and consistent with international agreements." *Id*. § 635(b)(1)(B).  In addition, the Bank must work with other ECAs to "minimize competition in government-supported export financing." *Id*. § 635(b)(1)(A).

In requiring the Ex-Im Bank to be competitive, Congress has emphasized that the Bank must process financing applications efficiently and with flexibility, so as not to cause a U.S. exporter to lose an export opportunity.  *See id*. § 635(b)(1)(B) (the Bank's loans should "neutralize the effect of … foreign credit on international sales competition"); *see also* S. Rep. No. 99-274, at 8 (1986) (recognizing "the need for [the Bank] to respond to exporters' requests for support in a timely … fashion"); *id*. (noting that the adverse economic impact provision of the Bank Act "should be implemented in a way that does not reduce the Bank's competitiveness and flexibility in assisting U.S. exporters nor ignore the positive aspects of the export sale").

The Bank Act also contains several provisions requiring the Bank and its Board of Directors ("Board") to take into account potential serious adverse effects on U.S. industry and employment when considering a proposed transaction.  For example, in 1978 Congress amended the Bank Act to include the provision now codified at 12 U.S.C. § 635a-2, which calls on the Bank to "implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries[.]"  *Id*.; *see* Pub. L. No. 95-630, § 1911, 92 Stat. 3641, 3726 (1978).

The Bank Act also provides, among other things, that the Bank may not extend a financial guarantee for the "production of any commodity for export by any country other than the United States" if the Board determines that "(i) the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold; or (ii) the resulting production capacity is expected to compete with United States production of the same, similar, or competing commodity." 12 U.S.C. § 635(e)(1). Such a limitation does not apply, however, when the Board determines that the "short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity." *Id*. § 635(e)(3). Section 635(e), moreover, provides that "[i]f … the Bank conducts a detailed economic impact analysis or similar study," it must provide notice and obtain comments on the potential economic effects of the financing support. *Id*. § 635(e)(7)(B)(i). Under this provision, the Bank must consider certain factors when conducting a detailed economic analysis. *See id*. § 635(e)(7)(A).

### B.  Litigation History: *ATA* And *Delta I*

Before addressing the lawsuit that presently is before the Court, it is helpful to provide context and some relevant procedural history regarding the broader litigation battle being waged against Defendants by members of the U.S. airline industry. This litigation started in 2011, when the Air Transport Association of America, ALPA, and Delta challenged the Bank's loan guarantee commitments for Air India's purchase of certain Boeing aircraft, which the Bank reviewed under its 2007 EIPs. *See generally Air Transp. Ass'n of Am. v. Export-Import Bank* ("*ATA*"), 878 F. Supp. 2d 42 (D.D.C. 2012). The 2007 EIPs considered, as a categorical screen, whether the proposed transaction would result in the foreign production of an exportable good; if it did not, the transaction was not subjected to further in-depth economic impact analysis. *See id*.

at 71.  Because the Bank deems aircraft transactions to result in the foreign provision of a service

(*i.e.*, airline seats) and not the production of an exportable good, such transactions were

categorically screened from detailed economic impact analysis by what is known as the

"exportable goods screen."  *Id.*

In *ATA*, Judge Boasberg granted summary judgment in favor of Defendants, concluding

that the "Bank acted neither arbitrarily and capriciously nor contrary to its governing statute

when it approved the" Air India commitments under the 2007 EIPs and the exportable goods

screen.  *Id.* at 54.  On appeal, the D.C. Circuit reversed, "conclud[ing] simply that the Bank [had]

failed to reasonably explain" the basis for the exportable goods screen.  *See Delta Air Lines, Inc.*

*v. Export-Import Bank* ("*Delta I*"), 718 F.3d 974, 975 (D.C. Cir. 2013) (per curiam).  The D.C.

Circuit directed that the matter be remanded to the Bank, without vacating any of the Bank's

actions, in order for the Bank either to provide a reasonable explanation for the exportable goods

screen, or to consider and explain any adverse effects that the Air India loan guarantees would

have on U.S. industry and employment.  *See id.* at 978.  The Bank responded on remand by

preparing and publishing two documents, entitled Response One and Response Two.[2]

### C.  The 2013 EIPs And Guidelines

Though Congress did not require the Bank to modify the 2007 EIPs, or the way in which

the Bank applied them, when it reauthorized the Bank in May 2012, the Bank undertook to revise

its EIPs anyways, as it has done from time-to-time throughout its existence.  Thus, in September

2012, the Bank solicited comments in the Federal Register on its proposed "Economic Impact

---

[2]        Response One is the Bank's attempt to provide an explanation for how the
exportable goods screen squares with the Bank Act, while Response Two attempts to explain any
adverse effects that the Air India loan guarantees may have domestically.  Plaintiffs have brought
a separate lawsuit challenging the sufficiency of the Bank's remand responses.  *See Delta Air
Lines, Inc. v. Export-Import Bank*, No. 14-cv-0042-RC (D.D.C. filed Jan. 10, 2014) ("*Delta IV*").

Procedures and Methodological Guidelines," and the Bank made the proposals available on its website.[3] *See* Administrative Record ("AR") at 3, 18.  On November 19, 2012, the Board adopted the new EIPs, as well as an explanation of the guidelines for conducting detailed economic impact analyses.  *See id*. at 3-17.  The Board made the new procedures effective as of April 1, 2013, to allow time for implementation, including time to commission an independent expert to conduct the structural oversupply analysis called for by the new procedures.  *See id*. at 3.  The so-called "2013 EIPs and Guidelines" remain in effect today.

The 2013 EIPs and Guidelines take a different approach to assessing certain potential transactions than the 2007 EIPs.  Specifically, under the new guidelines, proposed transactions resulting in the foreign provision of services are no longer categorically screened from in-depth economic impact analysis, as they were under the 2007 EIPs.  *See id*. at 559.  Instead, the Bank decided to subject to further review those transactions involving service sectors for which interested parties have identified specific cases of potential impact and have provided quantified estimates of potential harm.  *See id*. at 4 n.7.  The Bank then determined that, at the time of passing the new EIPs, "the only transactions creating an exportable service deemed to meet [these] criteria [are those involving] aircraft."  *Id*.; *see also id*. at 559.  The Bank therefore implemented aircraft-specific procedures within the 2013 EIPs and Guidelines that operate in stages, with the first two stages constituting "screens" designed to identify those aircraft transactions that merit detailed economic impact analyses, and the latter two stages summarizing the methodology for conducting such detailed analyses, when required.  *See id.* at 15-17.

---

[3]        *See* Export-Import Bank, Economic Impact Policy, 77 Fed. Reg. 59,397 (Sept. 27, 2012); Proposal, Export-Import Bank of the United States, Economic Impact Procedures and Methodological Guidelines (Sept. 27, 2012), *available at* http://www.exim.gov/General bankpolicies/economicimpact/upload/9-27-2012-Proposal-Economic-Impact-Proceduresand-Methodological-Guidelines.pdf.

### D.  The Present Litigation: *Delta II*

On February 13, 2013, Plaintiffs filed the present lawsuit, *Delta II*, asserting a facial challenge to the aircraft-specific procedures in the 2013 EIPs and Guidelines.  Although their suit was filed before the effective date of the new EIPs, Plaintiffs nonetheless allege, among other things, that the 2013 EIPs and Guidelines violate the Bank Act, that the new EIPs were developed in violation of the APA's rulemaking procedures, and that the new EIPs are arbitrary and capricious in violation of the APA.  As a remedy, Plaintiffs request that the Court vacate the 2013 EIPs and Guidelines.[4]

## III.  ANALYSIS

In this lawsuit, Plaintiffs allege that the Ex-Im Bank and its Board violated various aspects of the Bank Act and the APA through the development and adoption of the 2013 EIPs and Guidelines.  But unlike in *ATA*, where the plaintiffs challenged the Bank's approval of specific financial commitments to Air India for the purchase of certain Boeing aircraft, Plaintiffs here challenge only the facial validity of the Bank's new procedures, not any specific application of those procedures to an actual financing decision, as the new EIPs were not in effect at the time this lawsuit was filed.

As always, before the Court may reach the merits of Plaintiffs' claims, it first must ensure that it has the jurisdiction to decide those questions.  *See, e.g.*, *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) ("[E]very federal court has a 'special obligation to satisfy

---

[4]       In addition to *Delta IV* and the present lawsuit, *Delta II*, Plaintiffs have a third pending suit against the Bank.  In *Delta Air Lines, Inc. v. Export-Import Bank*, No. 13-cv-0424-RC (D.D.C. filed Apr. 3, 2013) ("*Delta III*"), Plaintiffs challenge the Bank's decision to approve a series of aircraft financing transactions that were first approved under the 2007 EIPs and then evaluated by the Bank on a voluntary remand under the 2013 EIPs and Guidelines.

itself" of its own jurisdiction before addressing the merits of any dispute." (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986))).  The Court therefore starts with the thorny question of whether Plaintiffs possess standing to bring this lawsuit, as well as the closely related question of whether Plaintiffs' claims are ripe for judicial review.  But because the Court ultimately concludes both that Plaintiffs lack standing under Article III and that their facial challenge to the 2013 EIPs and Guidelines is not ripe, the Court's analysis ends there.  As such, consideration of the merits of Plaintiffs' challenge to the 2013 EIPs and Guidelines must be left for another day.

### A.  Legal Standard

The Court must adjudicate Defendants' standing and ripeness arguments under the standard applicable to Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction. *See Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 154 (D.D.C. 2011) (citing *Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 363-64 (D.C. Cir. 2005)).  Thus, in evaluating Defendants' motion to dismiss, the Court must "treat the complaint's factual allegations as true … and must grant plaintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).  Ultimately, to survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of proving that a court has subject-matter jurisdiction to hear the claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).

Further, the Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185

F. Supp. 2d 9, 13 (D.D.C. 2001).  "For this reason 'the [p]laintiff[s'] factual allegations in the complaint … will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Id*. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).  Finally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens*, 402 F.3d at 1253; *see also Venetian Casino Resort*, 409 F.3d at 366; *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

### B.  Standing Analysis

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) (discussing the case-or-controversy requirement).  "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'"  *Dominguez*, 666 F.3d at 1361 (quoting *Allen*, 468 U.S. at 750).  Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan*, 504 U.S. at 560, the finding that a plaintiff has standing is a necessary "predicate to any exercise of [a court's] jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996).

"Every plaintiff in federal court," consequently, "bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability."  *Dominguez*, 666 F.3d at 1362 (quoting *Lujan*, 504 U.S. at 560-61).  Taken together, these elements require a plaintiff to demonstrate the existence of a "personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct and

likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751 (citation omitted). In addition, when multiple plaintiffs bring the same claims, a court need only ensure that one of those plaintiffs has standing to pursue them. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("[I]f constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim." (citations omitted)). Finally, standing is assessed by considering the facts at the time the complaint was filed. *See Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (citing *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)); *La Botz v. Fed. Election Comm'n*, No. 13-cv-997, 2014 WL 3686764, at *4 (D.D.C. July 25, 2014) ("[S]tanding in the present action is ascertained from the facts as they existed when [the plaintiff] first filed his complaint in this Court[.]" (citing *Lujan*, 504 U.S. at 570 n.4)).

Through their motion to dismiss, Defendants argue that this Court lacks subject-matter jurisdiction to hear Plaintiffs' claims because Plaintiffs have not demonstrated that they suffered an injury-in-fact that is concrete and imminent following the mere adoption of the 2013 EIPs and Guidelines. *See* Defs.' Mem. Supp. Mot. Dismiss, ECF No. 14-1, at 24-25. In particular, Defendants assert that any alleged injury to Plaintiffs was highly speculative and abstract at the time of filing this lawsuit — which was before the 2013 EIPs and Guidelines became effective and thus before the procedures were applied to authorize any financing transaction — because numerous yet-unknown variables will affect if and how Plaintiffs actually suffer any harm from the Bank's future application of the new EIPs. *See id*. at 25-26. Defendants further propose that the competitor standing doctrine does not save Plaintiffs because the Bank's actions before Plaintiffs filed the complaint were too attenuated from the hypothetical future competitive harm Plaintiffs might potentially suffer as a result of that action. *See id*. at 28-29.

In response to Defendants' motion, Plaintiffs categorize their lawsuit as a "procedural rights case" and argue that they can establish standing by showing that, first, § 635a-2 was designed to protect their "concrete interests," and second, they face a "distinct risk of injury" to those interests if the 2013 EIPs and Guidelines remain in effect, regardless of the fact that the Bank had not yet applied them to authorize a financing transaction. *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 47-49. To support this analysis, Plaintiffs rely extensively on the opinion in *ATA*, including Judge Boasberg's statement that "the evidence submitted by [p]laintiffs decisively establishes what seems a matter of common sense: the loan guarantees provided by the Ex-Im Bank to foreign airlines, in the aggregate, have injured ATA's members." *ATA*, 878 F. Supp. 2d at 57. Because the crux of both parties' standing arguments is whether an Article III injury-in-fact has occurred, the Court focuses its analysis accordingly.[5]

### 1. Injury-In-Fact: Imminence And Competitive Injury

To establish an injury-in-fact, a plaintiff must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted). The Supreme Court has explained that "'[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes[.]'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2). Accordingly, the Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and

---

[5]     Defendants do not challenge whether the causation and redressability requirements of Article III are satisfied, nor do Defendants suggest that Plaintiffs lack prudential standing. *Cf. ATA*, 878 F. Supp. 2d at 63-65 (finding that plaintiff Air Transport Association of America satisfied the causation, redressability, and prudential standing requirements).

that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 148, 158 (1990); emphasis and alteration in *Clapper*); *see also United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989) ("[A]ny petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing."); *Harrington v. Bush*, 553 F.2d 190, 208 (D.C. Cir. 1977) ("[T]he fact that the alleged harm is to occur in the future can … lessen the concreteness of the controversy and thus mitigate against a recognition of standing.").

Plaintiffs here also must overcome a significant hurdle in that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen*, 468 U.S. at 758). One such way to establish standing, however, is the D.C. Circuit's recognition that "economic actors 'suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998); alteration in *Sherley*); *see also New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (noting that under the "basic law of economics," increased competition can lead to actual injury). This so-called "competitor-injury doctrine" "'recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement].'" *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (quoting 3 K. Davis & R. Pierce, Admin. Law Treatise 13-14 (3d ed. 1994); alterations in *Clinton*).

The D.C. Circuit "cases addressing competitor standing have articulated various formulations of the standard for determining whether a plaintiff asserting competitor standing

has been injured." *Sherley*, 610 F.3d at 73.  It is clear, though, that the injury-in-fact requirement

may be satisfied at some point before an injury from increased competition actually occurs.  *See*

*id*. at 72.  Accordingly, "[b]ecause increased competition almost surely injures a seller in one

form or another, he need not wait until 'allegedly illegal transactions … hurt [him]

competitively' before challenging the regulatory … governmental decision that increases

competition."  *Id*. (quoting *La. Energy*, 141 F.3d at 367).  Thus, so long as a plaintiff can

demonstrate an "imminent increase in competition," courts recognize that the "increase … will

almost certainly cause an injury in fact."  *Id*. at 73.

It remains indispensable, however, that the increase in competition and the corresponding

injury are "imminent" and not merely "speculative."  *Compare La. Energy*, 141 F.3d at 367

(finding competitor standing only when the injury was "imminent"), *and Sherley*, 610 F.3d at 73-

74 (same), *with DEK Energy Co. v. FERC*, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (finding no

competitor standing when there was only "some vague probability" of increased competition and

"a still lower probability" of injury to plaintiff stemming from that competition).  Put slightly

differently, to demonstrate a constitutionally sufficient competitive injury, a plaintiff must show

that the challenged action — here, the adoption of the 2013 EIPs and Guidelines — has "the

clear and immediate potential" to cause competitive harm.  *Associated Gas Distribs. v. FERC*,

899 F.2d 1250, 1259 (D.C. Cir. 1990); *see also New Eng. Pub. Commc'ns Council, Inc. v. FCC*,

334 F.3d 69, 74 (D.C. Cir. 2003) (finding competitor standing only when the "injury [was] both

clear and immediate").

## 2.  An Initial Comment About ALPA

A brief comment about ALPA's potential standing is useful before the Court continues

with the injury-in-fact analysis.  It is well settled that if constitutional and prudential standing

exist for at least one plaintiff, standing is satisfied for the other plaintiffs who raise the same

claims. *See Mountain States Legal Found.*, 92 F.3d at 1232. Thus far, the Court has referred to

"Plaintiffs" as one collective entity, but Plaintiffs are, of course, the combination of two distinct

parts: the airlines (Delta and Hawaiian) and the organization (ALPA). The Court, however,

focuses the below analysis on the injury suffered by the plaintiff-*airlines* because ALPA's

member-pilots are not direct competitors to foreign airlines, so, factually speaking, their alleged

injury only will be derivative of the alleged injury suffered by the airlines for which they work.

*Cf. Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11-12 (D.C. Cir. 2011) (discussing

organizational standing). Thus, though ALPA represents thousands of pilots who work for

various U.S. airlines, including Delta and Hawaiian, *see* Compl. ¶ 16, ALPA's alleged injury

remains derivative of Delta's and Hawaiian's injury.[6]

### 3. The Plaintiff-Airlines Have Not Established A Clear And Imminent Injury

Because Plaintiffs bear the burden of demonstrating standing, *see Lujan*, 504 U.S. at 561,

the Court starts its analysis by considering their arguments for how they have suffered a

sufficient injury-in-fact under Article III. Here, Plaintiffs suggest that this is a "procedural rights

case,"[7] *see* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 47-48, and as such, the Court is

---

[6]     To be sure, if U.S. airlines at large suffer enough economic harm, their employees likely will suffer harm as well. Such harm, however, would occur only if the airlines are harmed first. It is not surprising, then, that in response to Defendants' standing arguments, Plaintiffs do not attempt to suggest any imminent loss of jobs or other independent harm to ALPA's members directly resulting from the adoption of the 2013 EIPs and Guidelines. *Cf. ATA*, 878 F. Supp. 2d at 50, 62-63 (finding injury-in-fact for plaintiff Air Transport Association of America, which represents U.S. *airlines*, not the pilots of those airlines). In addition, if Plaintiffs cannot show a direct and imminent injury as to Delta and Hawaiian, the Court is confident in concluding that other U.S. airlines would fail as well, such that other employers of ALPA's members also have not suffered any imminent underlying harm that theoretically might trickle down to the pilots.

[7]     The Court notes that Count I of the complaint does not seem to be a "procedural" claim at all because it challenges the 2013 EIPs and Guidelines as being inconsistent with the substantive requirements of the Bank Act and the Reauthorization Act. *See* Compl. ¶¶ 71-73.

required to ask only two questions: whether the procedural requirement with which the Bank allegedly failed to comply "was 'designed to protect some threatened concrete interest' of the plaintiff," and whether "the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc'y*, 94 F.3d at 664 (quoting *Lujan*, 504 U.S. at 573 n.8).

Plaintiffs then argue that § 635a-2, as well as other similar provisions such as § 635(b)(1)(B), are intended to protect participants in the domestic commercial airline industry and their employees, including Plaintiffs. *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 48. Indeed, in *ATA* Judge Boasberg concluded that these provisions are intended to serve this goal, and the Court agrees with that analysis. *See ATA*, 878 F. Supp. 2d at 63-64 (citing 12 U.S.C. §§ 635a-2 & 635(b)(1)(B) and finding that "[t]he provisions of the Bank Act [that] [p]laintiffs seek to enforce set forth procedural requirements explicitly intended to protect the concrete interests of domestic industry participants like ATA's members"). The relevance of such a finding is somewhat curtailed, however, because Judge Boasberg's pronouncement came within the context of redressability, not injury-in-fact. *See id.* Though by itself this distinction is far from remarkable, it gestures towards a broader frailty in Plaintiffs' standing argument — namely that although asserting a "procedural rights case" may indeed relax a court's critique of the redressability and causation elements, such a characterization does not relieve a plaintiff of its burden to establish that it has suffered a concrete and imminent substantive injury-in-fact under Article III.

For example, in *United Transportation Union v. ICC*, 891 F.2d 908 (D.C. Cir. 1989), the D.C. Circuit explained the role of the injury-in-fact requirement within the context of a procedural injury case:

> [B]efore we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a *substantive injury that would otherwise confer Article III standing*. Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements…. Indeed, if a procedural injury alone suffices to confer Article III standing, any American could sue any agency alleging that it is arbitrary and capricious not to have a procedure by which they can challenge agency action.

*Id*. at 918-19 (internal citations omitted; emphasis added) (concluding that "[g]iven the utter speculativeness of the petitioner's allegation of substantive injury [in this case], any allegation of procedural injury fails as well").

Similarly, and more recently, in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Supreme Court found that the plaintiff-environmental organizations lacked Article III standing after analyzing their "procedural rights" claim. In reaching this conclusion, the Court explained that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation — a procedural right *in vacuo* — is insufficient to create Article III standing." *Id*. at 496. Instead, "[o]nly a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id*. (quoting *Lujan*, 504 U.S. at 572 n.7; emphasis in *Summers*). As such, the Supreme Court held that

> [i]t makes no difference that the procedural right has been accorded by Congress. That can loosen the strictures of the redressability prong of our standing inquiry…. Unlike redressability, however, the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.[8]

---

[8]    *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), one of the preeminent Supreme Court standing cases, demonstrates this principle as well. In *Lujan*, plaintiffs alleged that the government had improperly limited the scope of a procedural "consultation" requirement under the Endangered Species Act. *See id*. at 558-59. In overturning the circuit court's ruling, the Supreme Court concluded that the "public interest in proper administration of the laws (specifically, in agencies' observance of a particular, statutorily prescribed procedure)" did not destroy the Article III injury requirement. *See id*. at 576-78. Thus, had plaintiffs' allegations of a procedural error by the agency been sufficient for standing, the case might have been allowed to proceed to the merits. But instead, the Supreme Court found that plaintiffs lacked standing

*Id.*; *see also Fla. Audubon Soc'y*, 94 F.3d at 664 (in procedural rights case, plaintiff must "show that the interest asserted is more than a mere general interest in the alleged procedural violation common to all members of the public[;] the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff" (internal citation and quotation marks omitted)).

Further inspection of *ATA*, moreover, reveals two useful points for analyzing the injury-in-fact requirement here: first, *ATA* is fully consistent with the above-described treatment of the injury-in-fact element in procedural rights cases; and second, *ATA* demonstrates exactly why Plaintiffs in this lawsuit have failed to boost themselves over the "hard floor" that is the substantive injury-in-fact requirement. *Summers*, 555 U.S. at 497. Regarding the first point, *ATA* used the procedural rights nature of the case to apply a more relaxed standard as to the redressability issue, not the injury-in-fact requirement. *See, e.g.*, *ATA*, 878 F. Supp. 2d at 63 ("This procedural-injury standard benefits Plaintiffs here [when analyzing redressability]."); *id.* at 64 ("Given the relaxed redressability standard applicable to claims of procedural right, that is all that is required."). This is consistent with the Court's explanation here that even if styled as a procedural rights case, Plaintiffs' burden to demonstrate a constitutionally sufficient injury is not, and cannot be, relaxed.

Turning to the second lesson from *ATA*, a comparison between Judge Boasberg's injury-in-fact analysis there and Plaintiffs' and Defendants' posture when this lawsuit was filed demonstrates exactly why this Court does not have jurisdiction over the present suit. To start, Plaintiffs here suggest that they have evidence of the following in support of their injury claim:

---

because they failed to show a concrete and particularized substantive injury beyond the mere procedural defect. *See id*. at 578.

as of June 2011, Delta competed with "Bank-subsidized" foreign airlines on thirty-seven non-stop routes, and Hawaiian competed on five non-stop routes; Delta and other U.S. airlines compete with "Bank-subsidized" foreign airlines on "hundreds of additional routes that U.S. carriers serve on a connecting basis"; Delta has at least one specific example in which it lost business as a result of "Bank-subsidized" competition; and "subsidized competitors" have lower costs to purchase and operate aircraft, causing U.S. airlines to lose customers and revenue. *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 50-51. From this evidence, Plaintiffs posit that the facts of this case are "comparable to the evidence that Judge Boasberg found 'decisively establish[ed]' that 'the loan guarantees provided by the Ex-Im Bank to foreign airlines, in the aggregate, have injured [U.S. airlines].'" *Id*. at 51 (quoting *ATA*, 878 F. Supp. 2d at 57).

Plaintiffs, however, attempt to answer the wrong question because immediately following Judge Boasberg's statement that past Bank loan guarantees have injured some U.S. airlines "in the aggregate," he continued:

> But Plaintiffs are not challenging the Bank's prior guarantees; instead, this suit is directed in particular at the 2011 Commitments to Air India. It is the sufficiency of Plaintiffs' showing of imminent injury with respect to those guarantees, accordingly, that Defendants primarily dispute. And while Plaintiffs' showing that prior Bank guarantees have injured ATA's members provides *some support* for their argument that this guarantee will imminently cause them injury,… it does *not* get them all the way there. *The Court must thus direct its attention to the injury that is directly attributable to the 2011 Air India Commitments*.

*ATA*, 878 F. Supp. 2d at 57 (internal citations omitted; emphasis added); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."). But unlike in *ATA*, this Court has no occasion to "direct its attention" to any "injury that is directly attributable" to a "particular" financing commitment approved under the 2013 EIPs and Guidelines because no such commitment had occurred at the time this lawsuit was filed; indeed,

the new EIPs were *not even in effect* when Plaintiffs filed their complaint.  *Compare* AR at 3

(2013 EIPs and Guidelines effective as of April 1, 2013), *with* Compl., ECF No. 1 (filed

February 13, 2013).  As such, the breadth of the Court's injury-in-fact analysis here is

significantly (and fatally) curtailed.

A closer look at *ATA* reveals why this is so problematic.  Specifically, the Court in *ATA*

was able to draw numerous factual conclusions regarding the concrete and immediate impact on

ATA and its member airlines from the specific Air India financing commitments that were

challenged, including that: the addition of multiple new aircraft to Air India's fleet would lower

the airline's overall cost structure and enable it to more aggressively price non-stop and

connecting services to the U.S.; the new aircraft would free up other planes for Air India to

expand service to North America or on other non-stop or connecting routes where ATA's

members might compete with Air India for customers; the new aircraft were likely to compete

directly with services provided by ATA's members and result in economic losses to those

members; and even if Air India did not use the new aircraft on U.S. routes, ATA's members

nonetheless would face increased direct competition on certain international routes.  *See ATA*,

878 F. Supp. 2d at 57-60.  The *ATA* Court therefore concluded that "[t]here is more than a 'vague

probability' that the subsidized planes will compete on routes served by ATA's members and an

*even more significant probability* that said competition 'will cause [those members] to lose

business or drop its prices.'"  *Id.* at 60 (quoting *DEK Energy*, 248 F.3d at 1196; second alteration

in *ATA*; emphasis added).

Here, on the other hand, Plaintiffs can offer facts that only demonstrate market conditions

historically and generally, not any particularized and concrete competitive harms that have

resulted or imminently will result from a specific financing commitment made by the Bank under

20

the new EIPs, as no such commitments existed.  These market conditions suggest only hypothetical risks that may or may not materialize depending on when, how, and to whom the Bank applies the 2013 EIPs and Guidelines for a future financing decision; consequently, they "do[] not get [Plaintiffs] all the way there." *Id.* at 57.  This is, of course, because Plaintiffs challenge the 2013 EIPs and Guidelines in the abstract, not in the context of a specific loan or loan guarantee issued to a foreign airline, as occurred in *ATA*.  In doing so, numerous factual questions remain unresolved and undeveloped, many of which are necessary for determining if and how Plaintiffs might suffer an injury-in-fact from the Bank's allegedly wrongful conduct.

More specifically, some of those unknown circumstances might include: which foreign airline will receive the Bank's financial support; how many aircraft that foreign airline will purchase, and which kind; where and when that foreign airline will put those aircraft into service, and once in service, whether those aircraft will compete directly with Delta's or Hawaiian's planes, and whether that direct competition occurs domestically or internationally; and whether the foreign airline actually is receiving more favorable financing terms from the Bank than are available elsewhere such that the Bank's financial support might have resulted in a price advantage to the foreign airline.[9]  *Cf. id.* at 57-63 (finding standing only after concluding that the plaintiffs were "direct competitors [of Air India] who have made a clear showing of injury"

---

[9]       The need for additional information is especially acute here because the foreign airline potentially receiving Bank financing likely will be an existing market participant.  *See* Defs.' Mem. Supp. Mot. Dismiss, ECF No. 14-1, at 32-33.  Thus, not only might the financing not impose a competitive injury by permitting a new market entrant, it also may be the case that the foreign airline will use the financing to replace its existing fleets, rather than increasing capacity.  Though replacing existing planes does not, in and of itself, mean that no competitive harm will occur — for example, the new planes likely will be more efficient or offer other competitive advantages that alter the foreign airline's cost structure and desirability — it does add another wrinkle to the injury-in-fact analysis, which, in turn, further gestures against finding standing merely based on the hypothetical application of the 2013 EIPs and Guidelines.

based on specific, known facts about the Bank's commitments, including which foreign airline was buying the planes, which type of planes would be purchased, when those planes would go into service, and which routes those planes would serve).[10]  Not all of these questions must be answered for Plaintiffs to have standing, but taken together, the missing facts reveal why the Court cannot find any "concrete" and "imminent" injury here.

Plaintiffs rely on *Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010), for the proposition that a "concrete interest in avoiding subsidized foreign competition supports standing," but the Court disagrees that *Sherley* compels a finding of standing under the facts of this case.  *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 49.  In *Sherley*, the D.C. Circuit explained that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them."  *Id*. at 72 (internal citation, quotation marks, and alterations omitted).  The court continued that "[b]ecause increased competition almost surely injures a seller in one form or another, he need not wait until allegedly illegal transactions hurt him competitively before challenging the regulatory (or, for that matter, the deregulatory) governmental decision that increases competition."  *Id*. (internal citation, quotation marks, and alterations omitted).

But fundamental to the decision in *Sherley*, as well as in competitor harm cases generally, was the underlying requirement that the agency has made a decision that increased, or imminently will increase, competition in a certain manner.  *See id*. at 73 ("Regardless how we

---

[10]     Indeed, Judge Boasberg found that the plaintiffs in *ATA* had established standing only after noting, among other things, that Air India *already* had used Bank-financed aircraft acquired through a prior Ex-Im Bank transaction not at issue in *ATA* to start a non-stop service between Mumbai and New York that directly competed with Delta's pre-existing service, and which allegedly caused Delta to discontinue that service after it became cost-prohibitive.  *See ATA*, 878 F. Supp. 2d at 57.

have phrased the standard in any particular [competitor standing] case,… the basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact."); *id*. at 74 (finding standing when "[t]here can be no doubt the Guidelines *will* elicit an increase in the number of grant applications involving [embryonic stem cells]; indeed, the Government never suggests otherwise.  Because the Guidelines *have intensified the competition* for a share in a fixed amount of money, the plaintiffs *will have to invest more time and resources* to craft a successful grant application.  That is an actual, here-and-now injury." (emphasis added)).

On the other hand, the case law is clear that when the prospect and nature of future competition remains indeterminable and amorphous pending future clarifying events that post-date the filing of the complaint, as is the case here, the competitive injury requirement is not satisfied.  *Compare Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (finding injury-in-fact under competitor standing doctrine when it was clear that "the pilot program allows Mexico-domiciled trucks to compete with members of both [plaintiff interest] groups"), *with DEK Energy*, 248 F.3d at 1195-96 (finding no injury-in-fact when there only was "some vague probability that any gas will actually reach that market and a still lower probability that its arrival will cause [plaintiff] to lose business or drop its prices").

Thus, in *New World Radio, Inc. v. FCC*, 294 F.3d 164 (D.C. Cir. 2002), the D.C. Circuit explained that the competitive harm doctrine applies only "to an agency action that itself imposes a competitive injury, *i.e.*, that provides benefits to an existing competitor or expands the number of entrants in the petitioner's market, not an agency action that is, at most, the first step in the direction of future competition."  *Id*. at 172.  The D.C. Circuit then highlighted that this distinction between agency action that imposes a direct and imminent competitive injury and

agency action that is a "first step" towards a future, still remote competitive injury following the

occurrence of yet-unknown substantial intervening events "is critical because [a plaintiff] *will*

have an opportunity to challenge any [agency] decision that directly affects it as a competitor"

once the necessary "chain of events" plays out.  *Id*. (emphasis in original); *see also Associated*

*Gas Distribs.*, 899 F.2d at 1259 (finding competitor standing because "the challenged action

authorized allegedly illegal transactions that have the clear and immediate potential to compete

with petitioners' own sales"); *Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) ("the

fact that the party (and the court) can 'imagine circumstances in which the party *could* be

affected by the agency's action' is not enough" for standing (citation and alterations omitted;

emphasis in original)).  Without doubt, Plaintiffs in this case will have such an opportunity if

they bring a lawsuit in the context of the Bank actually applying the 2013 EIPs and Guidelines to

approve a financing transaction.[11]

Finally, the Court points out that even if Plaintiffs were able to demonstrate an imminent

increase in competition from the enactment of the 2013 EIPs and Guidelines, which they cannot,

a further showing still is required to establish the type of harm recognized by the Bank Act.

Specifically, the relevant harm under the Bank Act is not whether Ex-Im Bank financing will

lead to increased competition between airlines, but rather whether the Bank's financing will

---

[11]     Plaintiffs' lawsuit in *Delta III* challenges a series of aircraft financing commitments that the Bank made between October 2012 and February 2013 under the 2007 EIPs.  In the decision resolving the parties' motions for summary judgment there, the Court grants judgment for Defendants on the basis that the Bank properly approved these transactions under the 2007 EIPs because the 2013 EIPs and Guidelines did not go into effect until April 1, 2013, which was after the challenged transactions were approved.  As a result, the Court in *Delta III* has no occasion to reach the merits of Plaintiffs' challenges to the 2013 EIPs and Guidelines, and it remains curious that Plaintiffs have not brought a lawsuit challenging a Bank financing commitment that places the new EIPs squarely at issue, such as a transaction in which the Bank actually uses these EIPs to authorize a financing commitment.

cause a "serious adverse effect" to U.S. industry and employment.  12 U.S.C. § 635(b)(1)(B)(ii).

Thus, although increased competition may be sufficient to establish standing in some contexts,

the increase only matters under the Bank Act to the extent that it actually will cause "serious"

harm to Plaintiffs.  And whether such "serious" harm will occur is even more speculative than

whether competition will increase from the Bank's financing, thus pulling Plaintiffs further away

from the Constitution's concrete and imminent injury requirement.

To conclude, "[a]lthough th[e] line drawing function of the standing rule is conceptually

clear, determining on which side of the line a particular factual situation falls is often quite

difficult."  *Joseph v. U.S. Civil Serv. Comm'n*, 554 F.2d 1140, 1145 (D.C. Cir. 1977) (citation

omitted).  The Court has encountered one of those difficult factual situations here.  Nonetheless,

after careful consideration and for the reasons explained above, the Court finds that Plaintiffs

have not demonstrated the concrete and imminent injury-in-fact that Article III demands.

Accordingly, the Court concludes that it must dismiss Plaintiffs' complaint for lack of

constitutional standing.

### C.  Ripeness Analysis

Alternatively, Defendants assert a second, independent bar to the Court's exercise of

jurisdiction: Plaintiffs' facial challenge to the 2013 EIPs and Guidelines is not ripe.  *See* Defs.'

Mem. Supp. Mot. Dismiss, ECF No. 14-1, at 33.  "The ripeness doctrine generally deals with

when a federal court can or should decide a case."  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382,

386 (D.C. Cir. 2012).  Part of this doctrine is subsumed into the Article III requirement of

standing, which demands that a plaintiff allege, among other things, an injury-in-fact that is

"imminent" or "certainly impending."  *See Nat'l Treasury Emps. Union v. United States*, 101

F.3d 1423, 1427-28 (D.C. Cir. 1996).  Even if a case is "constitutionally ripe," however, the

prudential aspect of ripeness may provide an independent basis for a court not to exercise its

jurisdiction. *See Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807-08

(2003).  Thus, "if the interests of the court and agency in postponing review outweigh the

interests of those seeking relief, settled principles of ripeness squarely call for adjudication to be

postponed." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C. Cir. 1986).

    Having found that Plaintiffs lack a sufficiently imminent injury to establish standing at

the time of filing the complaint, the Court will focus its present analysis on the prudential

ripeness doctrine, under which courts apply a familiar two-pronged balancing test: first, a court

must evaluate the "fitness of the issue for judicial decision"; and second, a court must consider

"the hardship to the parties of withholding [its] consideration." *Abbott Labs. v. Gardner*, 387

U.S. 136, 149 (1967).  Here, Defendants argue that Plaintiffs' challenge is not fit because

without any concrete financing commitment to evaluate, the lawsuit only raises a hypothetical

question about the propriety of the 2013 EIPs and Guidelines and further factual development

therefore is necessary. *See* Defs.' Mem. Supp. Mot. Dismiss, ECF No. 14-1, at 34.  In addition,

Defendants argue that Plaintiffs face no hardship justifying judicial intervention at this time

because the mere adoption of the 2013 EIPs and Guidelines does not require Plaintiffs to adjust

their conduct immediately or even in the near future. *See id*. at 35-36.

### 1.  Fitness

    "The fitness requirement is primarily meant to protect 'the agency's interest in

crystallizing its policy before that policy is subjected to judicial review and the court's interests

in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Am.

Petroleum Inst.*, 683 F.3d at 387 (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d

43, 49 (D.C. Cir. 1999)).  Courts also have an "interest in delaying review in order to avoid

'entangling [them]selves in abstract disagreements over administrative policies.'" *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1428 (D.C. Cir. 1988) (quoting *Abbott Labs.*, 387 U.S. at 148).   Among other things, then, "the fitness of an issue for judicial [review] depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation and quotation marks omitted).   Lastly, "[a]lthough both the fitness and hardship prongs encompass a number of considerations, a dispute is not ripe if it is not fit[.]" *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 n.4 (D.C. Cir. 2012) (citing *Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 817 n.19 (D.C. Cir. 1982)).

In response to Defendants' motion to dismiss, Plaintiffs argue that Count I, in which Plaintiffs allege that the new EIPs substantively violate the Bank Act and the Reauthorization Act, raises legal issues that would not benefit from further factual development, and as such, they are fit for judicial review.[12]   *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 42.   Indeed, the D.C. Circuit has "observed that a purely legal claim in the context of a facial challenge … is 'presumptively reviewable.'"   *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (quoting *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)).   But for many of the same reasons that standing is absent, the Court finds that further factual development is necessary (or at the very least, desirable) here.

---

[12]      Because Plaintiffs' arbitrary and capricious APA challenge in Count III also can be categorized as a legal question, the same arguments regarding Count I apply to Count III.   *See Atl. States Legal Found.*, 325 F.3d at 284 ("Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues." (citing *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1039 (D.C. Cir. 2002))); *Sec. Indus. & Fin. Mkts. Ass'n v. CFTC*, No. CV 13-1916, 2014 WL 4629567, at *25 (D.D.C. Sept. 16, 2014) (describing plaintiffs' arbitrary and capricious claim as a purely legal question within a substantive claim).

For example, to resolve Plaintiffs' substantive challenge to the new EIPs, the Court must consider the practical consequences of the Bank's actions on airline competition, the U.S. airlines, and the domestic economy — not just pure questions of statutory interpretation.  This is at least in part because the "Bank Act … leaves it to the Bank — not the courts — to determine both how the 'adverse effects' of a transaction on domestic industry and employment ought to be identified and when a more detailed inquiry is merited."  *ATA*, 878 F. Supp. 2d at 77.  It is near impossible, then, for the Court to evaluate whether the Bank's actions were consistent with the Bank Act in a factual vacuum, which is what occurs when the Court is asked to evaluate the facial validity of the 2013 EIPs and Guidelines outside the context of an actual financing decision.  Thus, as the D.C. Circuit has explained, "even purely legal issues may be unfit for review" when additional factual "developments are likely to assist the court in deciding the case."  *Atl. States Legal Found.*, 325 F.3d at 284-85.

*National Association of Regulatory Utility Commissioners v. U.S. Department of Energy*, 851 F.2d 1424 (D.C. Cir. 1988), is instructive.  There, petitioners challenged the Department of Energy's proposed methodology for allocating the cost of nuclear waste repositories between waste resulting from governmental activities and waste generated by civilian entities.  *Id*. at 1426-27.  The D.C. Circuit found that the challenge was not ripe because, among other reasons, the agency "ha[d] not applied its cost allocation method in a way that would allow [the court] to consider, by examining its 'concrete effects and implications,' whether it is consistent with the [Nuclear Waste Policy Act]."  *Id*. at 1428.  The court then rejected the petitioner's argument that "judicial interests favor review because the issues they raise are 'purely legal,'" explaining: "Assuming *arguendo* that this characterization of petitioners' substantive claims is correct, the court may still conclude that its 'deliberations might benefit from letting the question arise in

some more concrete and final form.'"  *Id.* at 1428-29 (quoting *State Farm*, 802 F.2d at 479).  The same conclusion holds true here, where the missing "more concrete and final form" is the actual application of the 2013 EIPs and Guidelines to a specific aircraft financing transaction.

Plaintiffs also argue that their Count I claim is ripe because, through Defendants' voluntary remand in *Delta III*, the Bank already has applied the 2013 EIPs and Guidelines to evaluate multiple financing transactions.  *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 42 n.37; *see also In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993*, 720 F.3d 354, 359 (D.C. Cir. 2013) ("[B]ecause 'ripeness is peculiarly a question of timing, it is the situation now … that must govern[.]'" (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974); second alteration in *Polar Bear*)); *Neb. Pub. Power Dist. v. MidAm. Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000) ("'[R]ipeness is peculiarly a question of timing' and is governed by the situation at the time of review, rather than the situation at the time of the events under review." (quoting *Anderson v. Green*, 513 U.S. 557, 559 (1995))).

But though perhaps instructive regarding the finality of the new guidelines, the Court is not convinced that the Bank's voluntary remand analyses in *Delta III* resolves the ripeness issue here.  In particular, the Bank's remand analyses are not being challenged before the Court in this lawsuit, *Delta II*; as such, the Court lacks adequate factual and legal analysis regarding these transactions, without which the Court cannot analyze the Bank's application of the 2013 EIPs and Guidelines and the consequences thereof, including if and how a specific financing decision might have harmed Plaintiffs' interests.  Thus, in short, the Court still faces "the classic institutional reason to postpone review: [it] need[s] to wait for 'a rule to be applied [to see] what its effect will be.'"[13]  *La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1385 (D.C. Cir. 1996)

---

[13]      *See also Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 ("Absent [a statutory

(quoting *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 674 (D.C. Cir. 1978)); *see also State of Tex. v. United States*, No. 96-cv-1274, 1997 WL 135419, at *3 (D.D.C. Mar. 17, 1997) ("Even if the claim raises only legal issues,… the court must also consider whether it or the parties would benefit from postponing review until the challenged issue has 'sufficiently 'crystallized' by taking on a more definite form.'" (quoting *City of Houston, Tex. v. U.S. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1431 (D.C. Cir. 1994))).

*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.-MDL No. 1993*, 720 F.3d 354 (D.C. Cir. 2013), a case on which Plaintiffs rely, provides a useful comparison to the facts of this litigation.  In *Polar Bear*, the U.S. Fish and Wildlife Service listed the polar bear as a threatened species and barred the importation of polar bear trophies.  *Id.* at 356.  The D.C. Circuit found that the Safari Club's APA claim was ripe because it raised "'purely legal' issues of statutory interpretation" and the agency had since applied the rule to deny at least two individual permit applications, which "render[ed] further factual development unnecessary." *Id.* at 359.  Thus, at the time of the court's review in *Polar Bear*, the scope, operation, and effect of the agency's rule were well known.  This is in stark contrast to Plaintiffs' lawsuit here, where the Court has not yet been afforded an opportunity to understand if and how the specific application of the 2013 EIPs and Guidelines might affect Plaintiffs; until then, the Court would be expending significant "'resources on what amounts to shadow boxing.'"  *Devia*

---

provision providing for immediate judicial review], a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some *concrete action applying the regulation to the claimant's situation* in a fashion that harms or threatens to harm him." (citation and quotation marks omitted; first alteration in original; emphasis added)).

*v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424-25 (D.C. Cir. 2007) (quoting *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003)).

Finally, in addition to their substantive challenges to the guidelines, Plaintiffs present a procedural question in Count II about whether the Bank was required to comply with the APA's notice-and-comment rulemaking requirement when adopting the new EIPs. *See* Compl. ¶ 76; *see also Nat'l Ass'n of Broadcasters v. FCC*, 569 F.3d 416, 424 (D.C. Cir. 2009) ("[W]hether the Commission violated the APA's notice and comment requirement … [is a] question[] of law where factual development would not aid review." (citation omitted)).[14]  The Court quickly disposes of this issue by relying on the well-worn principle of judicial economy, which dictates that when substantive claims are unripe, a court should delay reviewing related procedural claims until all related claims may be disposed of together in a later, single proceeding. *See, e.g.*, *Nat'l Ass'n of Regulatory Util. Comm'rs*, 851 F.2d at 1430 (delaying judicial review of claim that the Department of Energy should have followed APA rulemaking procedures because, among other reasons, "judicial economy favors considering all challenges to the Department's methodology, both substantive and procedural, in one proceeding"); *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 311 F. Supp. 2d 91, 101-02 (D.D.C. 2004) (declining to review claim that defendant failed to comply with notice-and-comment procedures in the "interest of judicial efficiency" after finding substantive claims unripe).

---

[14]     The Court recognizes that some of Plaintiffs' substantive challenges would not benefit from a more developed factual record if a transaction is screened at an early stage of the aircraft-specific procedures.  For example, at Stage II, Step 1 of the new procedures, the Bank determines whether the evaluated transaction exceeds $200 million in value, *see* AR at 15; if not, the Bank does not engage in further analysis under the EIPs and no additional factual development occurs.

2.  Hardship

"Although both the fitness and hardship prongs encompass a number of considerations, a dispute is not ripe if it is not fit[.]"  *Holistic Candlers*, 664 F.3d at 943 n.4 (citation omitted).  Thus, having found Plaintiffs' claims to be unfit, the Court need not also conclude that Plaintiffs will not suffer any hardship in order to dismiss the lawsuit as unripe.  Nonetheless, separate consideration of the hardship prong provides further support for the conclusion that judicial review of Plaintiffs' facial challenge to the 2013 EIPs and Guidelines would be inappropriate at this time.

When determining "hardship," courts consider a plaintiff's "interest in immediate review."  *Better Gov't Ass'n v. U.S. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986).  If "[t]he only hardship [a plaintiff] will endure as a result of delaying consideration of [the disputed] issue is the burden of having to [engage in] another suit," this will not suffice to overcome an agency's ripeness challenge.  *City of Houston*, 24 F.3d at 1432.  Similarly, "mere uncertainty as to the validity of a legal rule" does not constitute a "hardship" for purposes of ripeness analysis.  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 811.  By contrast, the D.C. Circuit has explained that "a paradigm case of 'hardship' under the second prong of *Abbott Laboratories*" occurs when a plaintiff faces the choice "between taking immediate action to their detriment and risking substantial future penalties for non-compliance."  *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1101 (D.C. Cir. 1995).  Thus, a plaintiff ordinarily may not bring a pre-enforcement challenge to an administrative action — which Plaintiffs do here — that does not, "as a practical matter, require the plaintiff to adjust his conduct immediately[.]"  *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (citation and quotation marks omitted).

Plaintiffs argue that delayed judicial review would impose a hardship on them because they currently are being deprived of certain procedures that were designed to protect them, namely in the form of the Bank's approval of financing commitments without first performing in-depth economic impact analysis.  *See* Pls.' Mem. Opp'n Mot. Dismiss, ECF No. 16, at 45-46. As a starting point, the Court finds that such an alleged hardship resides quite far from the "paradigm" ripeness case because it is clear that the 2013 EIPs and Guidelines require Plaintiffs neither to undertake "immediate action to their detriment" nor risk "substantial future penalties for non-compliance."  *Reich*, 57 F.3d at 1101.  Instead, the EIPs are internal procedures by which the Bank and the Board should abide, not external rules that directly mandate or circumscribe the conduct of other parties, including domestic or foreign airlines, or their pilots.  As such, the hardship requirement appears especially difficult for a disconnected third-party such as Plaintiffs to satisfy.

Nonetheless, Plaintiffs rely on *U.S. Air Tour Association v. FAA*, 298 F.3d 997 (D.C. Cir. 2002), to illustrate how a hardship may arise from delayed judicial review even without agency action directly requiring a plaintiff to adjust its conduct immediately.  In that case, an environmental group challenged the FAA's new definition of "natural quiet," which the group claimed was too permissive in terms of the number of air tours that the definition would permit to fly over Grand Canyon National Park.  *Id*. at 1003-05.  After finding that the challenge to the new definition raised "purely legal issues," the D.C. Circuit concluded that the group's members would suffer hardship from delayed review because "the members visit the park and wish to experience its natural serenity."  *Id*. at 1014.  *Air Tour* is distinguishable from the instant case, however, because the court there already had determined that the group's challenge "ar[o]se in the concrete setting of the [agency's] Limitations Rule," and there thus was "no reason to believe

that [] consideration of these issues would benefit from postponing review." *Id.* In addition, it was recognized in *Air Tour* that the challenged rule was having a known, direct, and immediate effect on the plaintiffs' enjoyment of the park. By contrast, the instant case involves legal questions that require additional factual development, and the specific impact of the challenged procedures on Plaintiffs' interests remains unsettled.[15]

Another instructive counterpoint comes from *Continental Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107 (D.C. Cir. 1974). There, the D.C. Circuit found a "substantial" hardship when the burden of complying with the Civil Aeronautics Board's new commercial airline seating arrangement policy "would be $2 million or one third of [one airline's] annual domestic operating profits," and the "sanction for noncompliance with the Board's policy is exposure to an adverse fare differential," which the circuit court described as a "sanction too punishing to be endured for any significant period of time." *Id.* at 126-27. Here, in contrast, Plaintiffs have not shown how they were required to alter their conduct due to the mere adoption of the 2013 EIPs and Guidelines, let alone risk any "punishing" sanction for their failure to do so. Indeed, until the new guidelines actually are applied in the context of a financing transaction,

---

[15]     In supplemental briefing on the Bank's motion to dismiss, Plaintiffs argue that they face additional hardship because the Bank withholds certain confidential business information, such as the number and type of aircraft being financed, until the deal is complete. *See* Pls.' Suppl. Mem. Opp'n Mot. Dismiss, ECF No. 32, at 4-5. In particular, Plaintiffs suggest that these details are required to demonstrate the irreparable harm necessary for a preliminary injunction. But the fact that harm only may be demonstrated once specific details about financing transactions are known also supports the conclusion that the Court should not decide substantive questions about the new EIPs in the abstract. At the same time, Defendants seem to take the position here that a U.S. airline such as Delta cannot sue unless it is injured in the context of a concrete financing commitment to a foreign airline, but then when Delta sues to challenge a specific financing commitment, like it does in *Delta III*, Defendants argue that Delta's injury should not be remedied because vacatur is inappropriate. This case, however, is not the proper context to address this apparent inconsistency.

their impact on Plaintiffs will remain purely theoretical; Plaintiffs simply face no "sanction" or "penalty" in the meantime.

Finally, the facts of this case are closely aligned to other situations in which the D.C. Circuit has found insufficient hardship to establish that a lawsuit is ripe for judicial review. For example, in *Devia v. Nuclear Regulatory Commission*, 492 F.3d 421 (D.C. Cir. 2007), the court found that the intervenors' claim of hardship was "insubstantial" because they were not required to engage in, or refrain from, any conduct while judicial review was delayed. *Id*. at 427. Likewise here, because the 2013 EIPs and Guidelines do not directly require any action by Plaintiffs, Plaintiffs remain "'free to conduct [their] business as [they] see[] fit'" while awaiting judicial review of an actual application of the 2013 EIPs and Guidelines. *Id*. (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. at 810).

The D.C. Circuit reached a similar conclusion in *Sprint Corp. v. FCC*, 331 F.3d 952 (D.C. Cir. 2003), by finding that Sprint's challenge to the Federal Communications Commission's decision to lift a ban on specialized area codes was unripe "until and unless" the agency actually "approve[d] a specialized overlay proposal" because before that time, Sprint remained "free to conduct its business" in the same manner and did not face any "adverse effects of a strictly legal kind" from the agency's order lifting the ban. *Id*. at 958 (citation and quotation marks omitted). In particular, the D.C. Circuit pointed out that the agency's action "'does not command anyone to do anything, or to refrain from doing anything; it does not grant, withhold, or modify any formal legal license, power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations.'" *Id*. (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. at 810). The same holds true here, where the new EIPs provide an internal process for determining whether the Bank should exercise its broad discretion to approve

a financing transaction; the guidelines simply are not an agency action that imposes legal obligations or denies legal rights to domestic airlines that are not eligible for the Bank's financing in the first place.

*      *      *

In sum, Plaintiffs' current challenge to the 2013 EIPs and Guidelines was made too early. Plaintiffs brought this lawsuit before the guidelines were in effect and, in turn, before the Bank had applied the new procedures to evaluate a potential financing commitment. As such, Plaintiffs' alleged injury-in-fact was speculative and uncertain, particularly when compared to the clear and imminent injury found in *ATA*, and compelling prudential ripeness concerns also require the Court to delay reviewing Plaintiffs' facial challenge until further factual development has occurred.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss.[16]  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 30, 2015                          RUDOLPH CONTRERAS
                                                United States District Judge

---

[16]      Because the Court grants Defendants' motion to dismiss, it also will deny as moot Defendants' and Plaintiffs' motions for summary judgment (ECF Nos. 43 & 44) and Plaintiffs' motion to supplement the administrative record (ECF No. 50).